Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| ROBERTO SANTIAGO VÉLEZ<br><br>Parte Recurrente<br><br>v.<br><br>DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN<br><br>Parte Recurrida | TA2026RA00243 | *Revisión Administrativa* procedente del Departamento de Corrección y Rehabilitación<br><br>Casos Núm.<br>J VI2023G0020;<br>J LA2023G0180;<br>J LA2023G0181;<br>J LA2023G0182<br><br>Sobre: Reclasificación de Custodia |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, el Juez Rodríguez Flores y la Jueza Díaz Rivera

## SENTENCIA

En San Juan, Puerto Rico, a 18 de junio de 2026.

Comparece por derecho propio y de forma *pauperis*[1] el señor Roberto Santiago Vélez (señor Santiago Vélez o recurrente) mediante el recurso de epígrafe suscrito el 5 de mayo de 2026, y recibido por nuestra Secretaría el 11 de abril de 2026.[2] Solicita que revoquemos la *Resolución de Hecho y Derecho* emitida y notificada el 19 de marzo de 2026, por el Comité de Clasificación y Tratamiento del Departamento de Rehabilitación y Corrección (DCR)[3], que ratificó el nivel de custodia máxima en que se encuentra el recurrente.

Examinado el recurso, el *Escrito en Cumplimiento de Resolución* presentado por el DCR a través de la Oficina del Procurador General y los documentos que conforman el apéndice, *confirmamos* el dictamen recurrido.

---

[1] El recurrente acompañó con su recurso una *Solicitud para Declaración de Indigencia,* debidamente cumplimentada y juramentada. SUMAC-TA, entrada 2. Se autoriza la litigación *in forma pauperis* del recurrente.
[2] *Revisión,* SUMAC-TA, entrada 1.
[3] *Resolución de Hecho y Derecho, Íd.,* apéndice 2.

## I.

Según surge de los documentos que conforman el expediente ante nuestra consideración, el señor Santiago Vélez fue sentenciado el 11 de marzo de 2024, por cargos al Artículo 93 A, enmendado a Homicidio, del Código Penal, y los Artículos 6.05, 6.14 y 6.22 de la Ley de Armas de Puerto Rico, y condenado a treinta y cinco (35) años y seis (6) meses de reclusión penitenciaria, junto con una pena especial totalizada en $1,200.00, que ya pagó. Cumple el mínimo de su sentencia el 11 de enero de 2034 y el máximo de la sentencia el 6 de marzo de 2051. El recurrente está clasificado en custodia máxima desde el 18 de marzo de 2024.

El 19 de marzo de 2026, el Comité de Clasificación y Tratamiento (CCT) efectuó una revisión rutinaria de custodia, plan institucional y bonificación adicional del señor Santiago Vélez. En igual fecha, emitió la *Resolución de Hecho y Derecho*. Surge de la Escala de Reclasificación de Custodia (Escala de Reclasificación) utilizada en su evaluación, que el CCT aplicó al señor Santiago Vélez una puntuación de cuatro (4) en el renglón de gravedad de los cargos/sentencias actuales. A continuación, le restó un (1) punto en el renglón correspondiente a la participación en programas/tratamiento y sustrajo dos (2) puntos adicionales en el renglón referente a la edad actual del confinado. De tal forma, la Escala de Reclasificación arrojó una puntuación de uno (1), que corresponde a un nivel de custodia mínima. Sin embargo, el CCT aplicó una de las "modificaciones discrecionales para un nivel de custodia más alto", denominada "historial de violencia excesiva". Como resultado, el CCT recomendó mantener el nivel de custodia en máxima.[4]

---

[4] *Escala de Reclasificación de Custodia (casos sentenciados),* SUMAC-TA, entrada 1, apéndice 3, págs. 5-7.

En las determinaciones de hechos, el CTT expuso lo siguiente:

El mpc en referencia ingresó al Centro de Ingreso y Clasificación Ponce 676 el 16 de mayo de 2023 con Auto de Prisión Provisional emitido el 16 de mayo de 2023 por cargos de Artículo 93 A (Asesinato en Primer Grado), Artículo 6.09 (Ley de Armas), Artículo 6.14.B (Ley de Armas) y Artículo 6.22 (Ley de Armas) con fianza de $1,000,000.00 por hechos cometidos en Yauco, PR el 13 de febrero de 2023.

El 22 de mayo de 2023 salió en Libertad Bajo Fianza (PSAJ).

El 11 de marzo de 2023 (sic) [reingresó] al Centro de Ingreso y Clasificación Ponce 676 con Auto de Prisión Provisional emitido por el Tribunal de Ponce por cargos de Artículo 93 A Enmendado [al] Artículo 95 (Homicidio), Artículo 6.05 (Ley de Armas), Artículo 6.22 (Ley de Armas) y Artículo 6.14 (Ley de Armas) sin fianza por hechos cometidos en Yauco, PR el 13 de febrero de 2023.

El 11 de marzo de 2024 el Tribunal de Ponce dictó sentencia de 35 años y 6 meses de prisión por los delitos de Artículo 93.A Enmendado a Artículo 95 (Homicidio), Artículo 6.09 Enmendado Artículo 6.05 (Ley de Armas), Artículo 6.14 B (Ley de Armas), Artículo 6.22 (Ley de Armas). Se impuso pago de Pena Especial Ley 183, un total de $1,200.00. Se desprende del expediente criminal evidencia original del pago de la Pena Especial Ley 183[.]

El 18 de marzo de 2024 el CCT acordó **clasificar inicialmente en custodia máxima** fundamentado en la sentencia impuesta y delitos a cumplir. Custodia en la cual se encue[n]tra.

El 20 de marzo de 2024 se le tomó la Muestra de **ADN Ley 175**.

Ingresó a la Instituci[ó]n Ponce Máxima Seguridad el 20 de marzo de 2024, procedente de la Instituci[ó]n Ponce 676.

En agosto de 2024 el mpc fue integrado al área educativa, Curso Vocacional de Sistemas de Oficina.

El 13 de noviembre de 2024 personal del Departamento de Correcci[ó]n y Rehabilitaci[ó]n le realizó prueba toxicológica rápida y arrojó resultados negativos al uso de (Marihuana, Opiáceos, Anfetaminas, Cocaína, Fenc[i]clidina, Antidepresivos Tricíclicos, Barbitúricos, Metadona, Benzodiacepina, Propoxifeno, Ocycodona, Metanfetaminas, Ecstasy, Fentanilo y Buprenorfina).

El 18 de noviembre de 2024[,] el CCT acordó asignar a labores en Ordenanzas B5-Izquierdo. Fue orientado sobre el Plan de Tratamiento Obligatorio.

El 19 de diciembre de 2024[,] se emitió comunicado del área de Physician Correctional, informando que el MPC se encuentra tomando las terapias de Trastornos Adictivos.

El 18 de febrero de 2025[,] el CCT acordó integrar en el tratamiento de Aprendiendo a Vivir sin Violencia, ofrecido por SEA.

El 6 de marzo de 2025[,] **completó** las **Terapias de Trastornos Adictivos**.

El 22 de abril de 2024[,] se recibió respuesta de Physician Correctional, informando que fue añadido a lista de espera para Terapias de Trastornos Adictivos.

**El 24 de abril de 2024[,] se recibió respuesta de Physician Correctional, informando que el mpc no presenta criterios para ser añadido a Terapias de Regulación del Coraje y Control de impulsos.**

El 1 de mayo de 2025[,] **completó** el tratamiento de **Aprendiendo a Vivir sin Violencia de SEA**.

Del expediente social se desprende Informe de Incidente en el área de trabajo con fecha del 2 de junio de 2025, la querella fue desestimada.

Continúa integrado al Curso Vocacional de Sistema de Oficina, se desprende evaluaciones catalogadas como buenas y excelentes.

**El 3 de marzo de 2026 personal del Departamento de Correcci[ó]n y Rehabilitaci[ó]n le realizó prueba toxicológica rápida, arrojando resultados negativos al uso de sustancias controladas.**

**Cumple el mínimo tentativamente el 11 de enero de 2034 y el máximo tentativamente para el 6 de marzo de 2051.**[5]

En sus conclusiones de derecho, el CCT indicó que la puntuación de uno (1) obtenida por la Escala de Reclasificación no reflejaba los elementos necesarios para una evaluación objetiva y completa del caso. Por ello, acogió la modificación discrecional de "historial de violencia excesiva", debido la naturaleza del delito cometido que surge del expediente del recurrente. El CTT consideró, además, las terapias, los cursos completados por el recurrente y la fecha prevista para referir su caso ante la Junta de Libertad Bajo Palabra (11 de enero de 2034, fecha en que cumple el mínimo de su

---

[5] *Resolución de Hecho y Derecho, Íd.*, apéndice 2. (Énfasis original).

sentencia); es decir, dentro de ocho (8) años, así como la fecha prevista de excarcelación (6 de marzo de 2051, dentro de veinticinco (25) años).

En desacuerdo con la determinación agencial, el señor Santiago Vélez presentó una solicitud de reconsideración. El 23 de abril de 2026, notificada el 7 de mayo de 2026, el DCR resolvió "[n]o [acoger] la solicitud de reconsideración" del recurrente y explicó que:

> El Comité de Clasificación y Tratamiento es el organismo responsable de evaluar la situación de cada confinado para determinar el plan de acción a tomar a fin de garantizar los objetivos de rehabilitación y seguridad pública enmarcados en los propósitos de la ley correccional. El Manual para la Clasificación de Confinados según enmendado señala que para cumplir con estos objetivos el Comité de Clasificación y Tratamiento debe tomar en consideración los siguientes datos básicos: delitos y sentencias actuales, historial delictivo anterior, y encarcelamientos previos bajo el DCR, fecha prevista de excarcelación, historial disciplinario, órdenes de detención o arresto, y de participación en programas, entre otros.

> En el caso que nos ocupa, fue sentenciado por el Tribunal de Ponce el 11 de marzo de 2024 por Artículo 93 A, Enmendado a Homicidio, Artículo 6.05 de la Ley de Armas, Artículo 6.14 B de la Ley de Armas, y Artículo 6.22 de la Ley de Armas. Para una sentencia total de 35 años en prisión. Además, se le impuso Pena Especial Ley 183 de $1,200.00, la cual ya pagó. Cumple el mínimo de su sentencia el 11 de enero de 2034 y el máximo de la sentencia el 6 de marzo de 2051.

> Clasificado inicialmente en custodia máxima el 18 de marzo de 2024.

> Tomando en consideración los delitos el Comité de Clasificación y Tratamiento determinó utilizar Modificación Discrecional (1) "Historial de Violencia Excesiva": **el confinado tiene historial documentado de conducta violenta, tales como <u>asesinato</u>, violación, agresión, intimidación con un arma o incendio intencional que no están totalmente reflejadas en la puntuación de historial de violencia**. Según se desprende de la información sometida el confinado se encontraba en el Negocio Pal Ocho en Yauco, P.R., sostuvo una discusión con Christian Oscar García Rivera ya que le dijo que le consiguiera sustancias controladas. El confinado alega que el perjudicado estaba medio borracho este discutió con otro cliente del negocio, se formó una pelea, el confinado intervino. Luego se dirigió a su vehículo a esperar a su esposa, el perjudicado lo siguió, prendió el vehículo que se había apagado por desperfectos mecánicos, llamó a su esposa y alegó que escuchó que alguien dijo "lo tengo

pillao, hoy lo mato" el confinado en ese momento disparó al confinado en diferentes partes del cuerpo causándole la muerte con un arma de fuego para la cual no tenía licencia. Alega que intentaron asesinarlo por venganza ya que su padre es policía retirado, además había intervenido en un asalto en casa de unos envejecientes en el que la víctima estuvo involucrad[a]. Por esto, el tribunal le sentenció a cumplir 35 años y 6 meses en prisión, de los cuales ha cumplido 1 año, 11 meses y 28 días.

Por otro lado, el Comité de Clasificación y Tratamiento consideró otros aspectos establecidos en el Manual para la Clasificación de Confinados como lo son la fecha prevista para referir el caso ante la Junta de Libertad Bajo Palabra (11 de enero de 2034, dentro de 8 años) y la fecha prevista de excarcelación (6 de marzo de 2051, dentro de 25 años).

Tomamos conocimiento de que completó las Terapias de Trastornos Adictivos el 6 de marzo de 2025. Además, completó las Terapias de Aprendiendo a Vivir sin Violencia el 1 de mayo de 2025. Se encuentra integrado en el curso vocacional de Sistema de Oficina.

Por lo antes señalado se concurre con las determinaciones tomadas por el Comité de Clasificación y Tratamiento. Deberá observar ajustes adecuados y satisfactorios en custodia máxima y cumplir con el plan institucional trazado por el Comité de Clasificación y Tratamiento. Recordando que el proceso de rehabilitación es complejo y necesita tiempo para lograr las metas trazadas.[6]

Inconforme aún, el 11 de mayo de 2026[7], el señor Santiago Vélez acudió ante este Tribunal de Apelaciones, mediante una *Revisión* y apuntó la comisión de los siguientes errores:

Erró la administraci[ó]n de correcci[ó]n, en violaci[ó]n al mandato constitucional de la rehabilitaci[ó]n moral y social al no reducir[le] la custodia al recurrente ampar[á]ndose en una modificaci[ó]n discrecional que no le aplica.

Erró la administraci[ó]n de correcci[ó]n, en violaci[ó]n a la constitución, al alterar las modificaciones discrecionales. En sus enmiendas reglamentarias mutando a las sentencias de 99 años o más como al recurrente la reducción de custodia por avances en su rehabilitaci[ó]n[,] ajustes y conducta excelente.

---

[6] *Oficina de Clasificación de Confinados: Supervisor de Clasificación* y *Trámite de Recibo de Petición de Reconsideración Supervisor Unidad Sociopenal, Íd.*, apéndice 3, págs. 1-2.

[7] El Señor Santiago Vélez indica en su recurso que no recibió respuesta a su solicitud de reconsideración, pero adjunta la determinación en reconsideración notificada por la agencia el 7 de mayo de 2026. Por ello, a pesar de que el recurrente suscribió prematuramente su recurso el 5 de mayo de 2026, por consideraciones de justicia y economía procesal, tomaremos como fecha de radicación la de su recibo por la Secretaría de este Tribunal, 11 de mayo de 2026.

> Err[ó] la administraci[ó]n de correcci[ó]n, en violaci[ó]n al mandato constitucional de la rehabilitaci[ó]n, al someter al recurrente a tiempo indeterminado por alternaciones modificaci[o]nales sin consideraci[ó]n alguna para [la] reduc[c]i[ó]n de custodia.

> Err[ó] la administraci[ó]n de correcci[ó]n, en violaci[ó]n al mandato constitucional al darle m[á]s peso a lo extenso de la sentencia en exclusi[ó]n de todos los dem[á]s factores importantes que deben tomarse en consideraci[ó]n y m[á]s a[ú]n si est[á]n relacionados con la rehabilitaci[ó]n, ajuste y conducta del recurrente.

En síntesis, el recurrente objeta la aplicación del criterio discrecional de "historial de violencia excesiva" para ratificar su nivel de custodia máxima.  Aduce que su conducta institucional justifica que se le coloque en un nivel de custodia más bajo, pues su historial social refleja que no representa una amenaza para la población correccional o sus empleados.  Así también, argumenta que no debieron haberle dado más peso del debido a la extensión de su sentencia.  Ante ello, solicita que el DCR reevalúe su caso y lo reclasifique en custodia mediana.

Por su parte, en su *Escrito en Cumplimiento de Resolución* de 10 de junio de 2026, el DCR argumenta que el expediente administrativo sustenta la aplicación de la modificación discrecional de "historial de violencia excesiva" para ratificar el nivel de custodia máxima del recurrente, razón por la que entiende que debemos conformar el dictamen recurrido.[8]

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

### A.

Es norma firmemente establecida que los tribunales apelativos han de conceder gran consideración y deferencia a las decisiones de los organismos administrativos. Ello, dado que las agencias administrativas cuentan con vasta experiencia y

---

[8] *Escrito en Cumplimiento de Resolución,* SUMAC-TA, entrada 10.

conocimiento especializado en cuanto a los asuntos que les han sido encomendados.[9]

Como resultado, la decisión de una agencia administrativa gozará de una presunción de legalidad y corrección que será respetada, siempre que la parte que la impugna no produzca evidencia suficiente para rebatirla.[10]

En cuanto a las determinaciones de hecho que realiza una agencia, estas serán sostenidas por el tribunal si se basan en evidencia sustancial que obra en el expediente administrativo.[11] Por evidencia sustancial se entiende "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión".[12] Por lo tanto, la parte afectada por la decisión administrativa deberá reducir el valor de la evidencia impugnada o demostrar la existencia de otra prueba que sostenga que la actuación del ente administrativo no estuvo basada en evidencia sustancial.[13]

Ahora bien, respecto a las conclusiones de derecho de las decisiones de las agencias administrativas, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU) señala que estas pueden ser revisadas en todos sus aspectos por el tribunal.[14]

Al respecto, recientemente, en *Vázquez v. Consejo de Titulares*,[15] el Tribunal Supremo hizo eco de la decisión del foro

---

[9] *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 839 (2021), citando a *OCS v. Universal*, 187 DPR 164, 178 (2012); *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800 (2012); *Pagán Santiago, et al. v. ASR*, 185 DPR 341, 358 (2012).

[10] *Transp. Sonnell, LLC v. Jta. Subastas ACT*, 214 DPR 633, 648 (2024); *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 215 (2012).

[11] Sec. 4.5 de la Ley de Procedimiento Administrativa Uniforme del Gobierno de Puerto Rico (LPAU), Ley Núm. 38-2017, 3 LPRA sec. 9675.

[12] *Rolón Martínez v. Superintendente*, 201 DPR 26, 36 (2018); *González Segarra et al. v. CFSE*, 188 DPR 252, 277 (2013); *Otero v. Toyota*, 163 DPR 716, 728-729 (2005).

[13] *Otero v. Toyota*, supra, pág. 728.

[14] Sec. 4.5 de la Ley Núm. 38-2017, 3 LPRA sec. 9675.

[15] *Vázquez v. Consejo de Titulares*, 216 DPR ___ (2025), 2025 TSPR 56 (resuelto el 21 de mayo de 2025).

federal en el caso *Loper Bright Enterprises v. Raimondo,*[16] y determinó que la interpretación de la ley es una tarea que corresponde inherentemente a los tribunales. En *Vázquez,* el Tribunal Supremo enfatizó la necesidad de que los foros judiciales, en el ejercicio de su función revisora, actúen con el rigor que prescribe la LPAU, *supra.* Puntualizó que, al enfrentarse a un recurso de revisión judicial proveniente de una agencia administrativa, será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos. Con ello, nuestro Tribunal Supremo pautó el fin de la deferencia absoluta a las apreciaciones de derecho arribadas por las agencias administrativas.[17] En conclusión, delimitó que la interpretación de la ley es una tarea que le corresponde a los tribunales y, como corolario, estos foros deben revisar las conclusiones de derecho en todos sus aspectos; ello, como mecanismo interpretativo del poder judicial.[18]

Por consiguiente, la deferencia concedida a las agencias administrativas únicamente cederá cuando: (1) la determinación administrativa no esté basada en evidencia sustancial; (2) el organismo administrativo haya errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el ente agencial actúe arbitraria, irrazonable o ilegalmente, al realizar determinaciones carentes de una base racional, o (4) cuando la actuación administrativa lesione derechos constitucionales fundamentales.[19]

En el contexto de las determinaciones administrativas sobre el nivel de custodia, el Tribunal Supremo ha opinado que, "[a]l

---

[16] *Loper Bright Enterprises v. Raimondo,* ___ U.S. ___, 144 S. Ct. 2244, 219 L.Ed.2d 832 (2024).
[17] *Vázquez v. Consejo de Titulares,* supra.
[18] *Íd.*
[19] *Super Asphalt v. AFI y otros,* 206 DPR 803, 819 (2021); *Torres Rivera v. Policía de Puerto Rico,* 196 DPR 606, 628 (2016); *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 744-745 (2012).

momento de determinarse la procedencia de un cambio en el nivel de custodia, deberá considerarse una serie de factores subjetivos y objetivos, para cuya atención se requiere la pericia del [Departamento de Corrección y Rehabilitación]".[20] También ha expresado que:

> Según el Manual, es al Comité de cada institución carcelaria a quien corresponde realizar la evaluación periódica correspondiente al nivel de custodia asignado a los confinados. (...)
>
> Por lo general, la composición de estos comités la conforman peritos en el campo tales como técnicos sociopenales y oficiales o consejeros correccionales. Estos profesionales cuentan con la capacidad, la preparación, el conocimiento y la experiencia necesarios para atender las necesidades de los confinados y realizar este tipo de evaluaciones. Por esta razón, una determinación formulada por el referido Comité debe ser sostenida por el foro judicial siempre que no sea arbitraria, caprichosa y esté fundamentada en evidencia sustancial. Es decir, siempre que la decisión sea razonable, cumpla con el procedimiento establecido en las reglas y los manuales, y no altere los términos de la sentencia impuesta, el tribunal deberá confirmarla.[21]

**B.**

Nuestro ordenamiento constitucional dispone que será política pública del Estado reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva, y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social.[22]

Cónsono con ello, el Artículo 10 del Plan de Reorganización Núm. 2-2011,[23] del DCR estatuye que:

> La población correccional será sometida a evaluaciones periódicas con el propósito de conocer y analizar su situación social, física, emocional y mental, historial delictivo e identificar sus capacidades, intereses, motivaciones, controles y limitaciones, a los fines de clasificarlos y determinar el plan de acción a tomar en cada caso, en armonía con los principios de tratamiento

---

[20] *Cruz v. Administración,* 164 DPR 341, 352 (2005).
[21] *Íd.,* págs. 354-355.
[22] Artículo VI, Sec. 19, Const. ELA [Const. PR], LPRA, Tomo 1; *López Borges v. Adm. Corrección,* 185 DPR 603, 619 (2012).
[23] *Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011,* 3 LPRA Ap. XVIII.

individualizado y seguridad pública enmarcados en los propósitos de este Plan.[24]

Así, el DCR aprobó el *Manual para la Clasificación de los Confinados*, Reglamento Núm. 9151 (Reglamento Núm. 9151) de 22 de enero de 2020, con el propósito de establecer un sistema organizado para ingresar, procesar y asignar a los confinados a instituciones y programas internos.[25]

Como parte de la política de la agencia, se encuentra la clasificación "de acuerdo con el nivel de custodia restrictiva más bajo que se requiera, la asignación de vivienda y la participación de los confinados en programas de trabajo y educación, adiestramiento vocacional y recreación que sean apropiados para ellos".[26] Precisamente, el Tribunal Supremo ha explicado que "la importancia de la reducción del nivel de custodia, como parte del proceso de rehabilitación, se refleja en la regla que enuncia constantemente el [Reglamento Núm. 9151]: se tiene que ubicar a cada confinado en el nivel de custodia menos restrictivo posible".[27]

De otro lado, el Artículo IV, Sección 1, del Reglamento Núm. 9151, *supra*, establece que el Comité de Clasificación y Tratamiento es el responsable de evaluar las necesidades de seguridad y de los programas de los confinados sentenciados. El Comité está encargado de la evaluación de los confinados, en lo concerniente a sus necesidades, aptitudes, intereses, limitaciones y funcionamiento social.[28] Sus objetivos primordiales son la rehabilitación, la asignación de custodia y la seguridad pública.[29]

---

[24] *Íd.*

[25] Artículo II, *Manual para la Clasificación de los Confinados*, Reglamento Núm. 9151 (Reglamento Núm. 9151) de 22 de enero de 2020, pág. 2.

[26] *Íd.*

[27] *López Borges v. Adm. Corrección*, supra, pág. 608. A pesar de que la citada opinión hace referencia al *Manual de Clasificación* de 2000, los principios invocados permanecieron inalterados en la versión del 2020. Véase *Perspectiva General*, Artículo I del Reglamento Núm. 9151, *supra*, pág. 1.

[28] Artículo IV, Sección 2, Reglamento Núm. 9151, *supra*, págs. 19-21.

[29] *Íd.*, pág. 20-21.

El sistema consta de una clasificación inicial del confinado, seguida de un proceso de reclasificación periódica de cada reo.[30] En lo atinente, una clasificación objetiva se refiere al:

> [P]roceso confiable y válido mediante el cual se clasifica a los confinados y se les subdivide en grupos, basándose en varias consideraciones, entre las que se incluyen: la severidad del delito, su historial de delitos anteriores, su comportamiento en las instituciones, los requisitos de seguridad y supervisión y las necesidades identificables de programas y servicios específicos.[31]

Además, la reglamentación establece que la reclasificación de confinados es el procedimiento para la revisión de la asignación del nivel actual de custodia de cada miembro de la población correccional con el fin de determinar cuán apropiada es esta.[32] Al exponer los fines perseguidos por dicho sistema, el Reglamento Núm. 9151, *supra,* dispone el uso del formulario *Escala de Reclasificación de Custodia (Casos Sentenciados)*, reproducido en el Apéndice K del cuerpo reglamentario, y aclara que:

> [...] La reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o la vivienda asignada. Su función primordial es verificar la adaptación del confinado y prestarle atención a cualquier situación que pueda surgir.
>
> La reevaluación de custodia se parece a la evaluación inicial de custodia, pero recalca aún más en la conducta institucional como reflejo del comportamiento real del confinado durante su reclusión. Es importante que los confinados que cumplan sentencias prolongadas tengan la oportunidad de obtener una reducción en niveles de custodia mediante el cumplimiento con los requisitos de la institución.[33]

La segunda sección de la *Escala de Reclasificación de Custodia,* denominada *Evaluación de Custodia,* detalla el proceso para revisar y actualizar la evaluación inicial del confinado. Esta contiene la escala de reclasificación de custodia para los casos de

---

[30] El Reglamento Núm. 9151, *supra,* define la reclasificación como la "[r]evisión periódica de los confinados en lo que respecta a su progreso como parte del Plan Institucional, así como también a su categoría de custodia". *Íd.,* Artículo IV, Sección 1, pág. 12.

[31] *Íd.,* pág. 5.

[32] *Íd.,* Artículo IV, Sección 7, págs. 52-54.

[33] *Íd.*

confinados sentenciados y enumera ocho criterios para realizar la correspondiente evaluación. Estos son: (1) la gravedad de los cargos y sentencias actuales; (2) el historial de delitos graves previos; (3) el historial de fuga o tentativas de fuga; (4) el número de acciones disciplinarias; (5) las acciones disciplinarias severo; (6) las sentencias anteriores por delitos graves como adultos; (7) la participación en programas, y (8) la edad actual del miembro de la población correccional.[34]

Una vez evaluados los ocho (8) renglones de la *Evaluación de Custodia* en la *Escala de Reclasificación de Custodia*, basado en el resultado que se obtenga, se recomienda un nivel de custodia que puede variar entre máxima, mediana o mínima. El nivel de custodia según la escala es el siguiente: 5 puntos o menos: custodia mínima; 5 puntos o menos si el confinado tiene una orden de arresto o detención: custodia mediana; 6 a 10 puntos: custodia mediana; 7 puntos o más en los renglones 1 al 3: custodia máxima, y 11 puntos o más en los renglones 1 al 8: custodia máxima.[35]

También, se establecen unas consideraciones especiales de manejo, las cuales versan sobre los asuntos de administración que merecen atención y posible intervención del personal en términos de vivienda o supervisión especial.[36]

La tercera sección de la *Escala de Reclasificación de Custodia* establece unos criterios adicionales, tanto discrecionales como no discrecionales. Una modificación discrecional se refiere al "conjunto de factores específicos de clasificación que el personal puede usar

---

[34] *Íd.*, Apéndice K, Sección II.

[35] *Íd.*, Sección III.

[36] Los factores de administración son los siguientes: custodia protectora (para garantizar su seguridad y bienestar); joven adulto (menor de 21 años); psiquiátricas; sesenta años o más de edad; riesgo de suicidio; problemas médicos; impedimentos físicos, y cualquier otra consideración de manejo relacionados con requisitos de vivienda o de supervisión especiales. *Íd.*, Sección III (B).

para modificar la puntuación de clasificación de un confinado, pero solamente con la aprobación del supervisor de clasificación".[37]

La reglamentación instituye unas **modificaciones discrecionales para un nivel de custodia más alto**.  Estas son: (1) la gravedad del delito; (2) **el historial de violencia excesiva**; (3) la afiliación con gangas; (4) la dificultad en el manejo del confinado; (5) los grados de reincidencia; (6) el riesgo de fuga; (7) el comportamiento sexual agresivo; (8) los trastornos mentales o desajustes emocionales; (9) si representa una amenaza o peligro; (10) la desobediencia de las normas o rehusarse al plan de tratamiento, y (11) el reingreso por violación de normas.[38]   En específico, la Sección III (D) del Apéndice K del Reglamento Núm. 9151, *supra,* define historial de violencia excesiva" de la siguiente manera:

> El confinado tiene un historial documentado de conducta violenta, tales como asesinato, violación, agresión, intimidación con un arma o incendio intencional que no están totalmente reflejadas en la puntuación del historial de violencia. Esta conducta puede haber ocurrido más de cinco años antes, durante un encarcelamiento o mientras estuvo asignado anteriormente a un programa comunitario.

> Se refiere a confinados cuyo historial de funcionamiento social o delictivo revele agresividad o que constantemente sus acciones manifiesten conducta violenta. Esta podría demostrarse a través de ataques físicos o tentativa de ataques a otros confinados, a oficiales de custodia, a empleados o a cualquier otra persona, acompañados estos en ocasiones por el uso de armas, vocabulario provocador a insultantes o destrucción de la propiedad.

> No obstante, para aumentar el nivel de custodia:

> Toda modificación discrecional deberá estar **basada en documentación escrita** proveniente de reportes disciplinarios, informes de querellas, informes de libros de novedades, documentos del expediente criminal o social, y cualquier otra información o documento que evidencia ajustes o comportamiento del confinado contrario a las normas y seguridad institucional.[39]

---

[37] *Íd.*, Artículo IV, Sección 1, pág. 8.
[38] *Íd.*, Apéndice K, Sección III (D).
[39] *Íd.* (Énfasis suplido).

En lo pertinente al recurso de epígrafe, el cual se enfoca en el criterio discrecional de historial de violencia excesiva, nuestro Más Alto Foro ha expresado que "no se circunscribe a la conducta del confinado en la institución".[40] El Tribunal Supremo aclara que:

> La definición del criterio brinda espacio para aplicar el criterio a confinados que poseen un historial documentado de conducta violenta y a confinados con un historial de funcionamiento social o delictivo que revelan agresividad o que contantemente sus acciones manifiestan una conducta violenta. Es decir, el criterio incluye pero no se limita a conducta dentro de la institución.
>
> [...]
>
> En ese sentido, el Manual ... no prohíbe que la agencia evalúe el funcionamiento social del confinado dentro de la institución, así como las circunstancias que rodean el delito cometido, como son: agresividad, conducta violenta, desprecio por la vida humana, entre otras.  Por eso, **no es contrario a nuestro esquema penal que el Departamento de Corrección tome en consideración el delito por el cual un confinado está cumpliendo la sentencia actual**. Se hace esto en aras de determinar la forma en que se va a cumplir la pena impuesta.[41]

Por otra parte, el Reglamento Núm. 9151, *supra,* incluye determinadas modificaciones no discrecionales.  Aunque no se define el término, de su cuerpo se desprende que estos factores inciden en la modificación de la clasificación de custodia y la persona que califica no tiene discreción en cuanto a su aplicación, sino que debe limitarse a anotar si el confinado cumple o no con los criterios consignados. Las condiciones pertinentes son: (1) confinados con sentencias de 99 años o más; (2) orden de deportación, y (3) más de 15 años antes de la fecha máxima de libertad bajo palabra.[42]

### III.

En su recurso, el recurrente objeta la aplicación del criterio discrecional de "historial de violencia excesiva" para ratificar su nivel

---

[40] *Lebrón Laureano v. Depto. Corrección*, 209 DPR 489, 510-511 (2022).
[41] *Íd.,* págs. 510-511. (Énfasis suplido).
[42] Apéndice K, Sección III (C) del Reglamento Núm. 9151, *supra.*

de custodia máxima. Aduce que su conducta institucional justifica que se le coloque en un nivel de custodia más bajo, pues su historial social refleja que no representa una amenaza para la población correccional o sus empleados. Así también, argumenta que no debieron dar más peso del debido a la extensión de su sentencia. Por estar estrechamente relacionados, discutiremos los cuatro señalamientos de error conjuntamente.

En el presente caso, el DCR completó la Escala de Reclasificación a tenor con las instrucciones del Apéndice K del Reglamento Núm. 9151, *supra*. Así, aunque la puntuación de uno (1) de la Parte II de la Escala de Reclasificación cualifica al señor Santiago Vélez para una custodia mínima, el reglamento requiere que se tomen en consideración otros aspectos, como lo son las modificaciones discrecionales. El DCR aplicó la modificación discrecional sobre "historial de violencia excesiva", dada la naturaleza del delito cometido que surge del expediente del recurrente. El DCR sopesó la naturaleza y comportamiento, y no la extensión de la sentencia, durante la comisión de los delitos por los cuales el recurrente cumple su condena para ejercer su discreción y recomendar que este permaneciera en custodia de máxima seguridad. Según bosquejado, este criterio no solo acapara el comportamiento del miembro de la población correccional dentro de la institución penitenciaria, sino que considera las circunstancias que rodean el delito cometido, lo cual incluye la conducta violenta y el desprecio por la vida humana.

El DCR no descansó en este único factor de "historial de violencia excesiva" para amparar su determinación, sino que analizó el conjunto de criterios del esquema reglamentario para ratificar el nivel de custodia máxima del señor Santiago Vélez. La agencia consideró, además, la fecha prevista para referir el caso del recurrente ante la Junta de Libertad Bajo Palabra (11 de enero de

2034, fecha en que cumple el mínimo de su sentencia); es decir, dentro de ocho (8) años, así como la fecha prevista de excarcelación (6 de marzo de 2051), dentro de veinticinco (25) años. También reconoció las terapias completadas por el recurrente durante su confinamiento. Es menester acentuar que la rehabilitación es un proceso paulatino y que el DCR le proveerá las herramientas al señor Santiago Vélez para que continúe observando ajustes institucionales bajo máximas restricciones físicas.

El marco de revisión de este Tribunal se circunscribe a un estándar de razonabilidad. Conforme a la reglamentación aplicable, el DCR tiene la discreción de analizar caso a caso los criterios establecidos para evaluar el nivel de custodia en el cual debe estar cada confinado, en ánimo de salvaguardar tanto su efectiva rehabilitación, como la seguridad institucional y de la población confinada.[43] En ese contexto, concluimos que la determinación recurrida se fundamentó en el expediente administrativo y constituyó una actuación razonable de la agencia administrativa.

En resumen, la determinación administrativa merece nuestra deferencia. Las determinaciones de hechos de organismos y agencias tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca evidencia suficiente para derrotarlas. El señor Santiago Vélez no demostró que el DCR actuara de manera irrazonable, caprichosa, ilegal o fuera del marco de los poderes delegados a ésta. Por lo tanto, los errores indicados por el señor Santiago Vélez no fueron cometidos y procede confirmar el dictamen recurrido.

**IV.**

Por los fundamentos antes esbozados, *confirmamos* la *Resolución* recurrida.

---

[43] *Lebrón Laureano v. Depto. Corrección,* supra, pág. 513.

Notifíquese al señor Roberto Santiago Vélez, quien se encuentra bajo la custodia del Departamento de Corrección y Rehabilitación (DCR): Institución Ponce Máxima Seguridad, 448 Control: D-2, Derecho Celda 1-018, 3699 Ponce by Pass, Ponce, PR 00728-1500, o en cualquier institución en donde se encuentre.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones